**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 05-38302 SBB |
| GARY LEE BRYAN | ) | |
| SS#xxx-xx-5578 | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| M. STEPHEN PETERS, Chapter 7 trustee, | ) | Adversary Proceeding No. 08-01102-SBB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| GARY LEE BRYAN, | ) | |
| JANEL K. BRYAN, | ) | |
| VECTRA BANK COLORADO, N.A., | ) | |
| AUTO SOURCE, LLC, and | ) | |
| BRAD HUNT, | ) | |
| Trustee of The Bryan Family Trust, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OPINION AND ORDER**

---

THIS MATTER comes before the Court on the Plaintiff's Complaint and the Amended Answer thereto filed by Defendants Gary Lee Bryan ("Debtor"), Janel K. Bryan ("Mrs. Bryan"), Auto Source, LLC, and Brad Hunt, Trustee of The Bryan Family Trust. The trial in this adversary proceeding was held on April 2, 3, and 5, 2009. The Court, having reviewed the pleadings and considered the testimony, exhibits, arguments of counsel, and legal authority cited by the parties, makes the following findings of fact, conclusions of law, and enters the following Order.

**TABLE OF CONTENTS**

I.      Summary ................................................................................................ 1

II.     Jurisdiction ......................................................................................... 2

III.    Procedural Background ..................................................................... 2

IV.     Findings of Fact ................................................................................. 3

      A.    The Parties to this Action. ................................................... 3

      B.    The Bankruptcy ....................................................................... 4

      C.    The Bryan Family Trust ......................................................... 4

      D.    The One Finch Property ......................................................... 6

      E.    The Leases ................................................................................ 7

      F.    The February 2003 Refinance. ............................................. 8

      G.    The Scientific Cylinder Transaction ................................. 9

      H.    The January 25, 2005 Refinance ...................................... 11

      I.    The May 9, 2005 Home Equity Line of Credit ............... 13

      J.    The 2003 Range Rover ......................................................... 15

      K.    Credibility of Witnesses ...................................................... 16

V.      Discussion. ......................................................................................... 16

      A.    Plaintiff's First Claim for Relief - Declaratory Relief ... 16

          1.    11 U.S.C. § 541 ......................................................... 16

          2.    Colorado Spendthrift Trusts ................................. 17

          3.    Sham Trusts ............................................................... 20

              a.    Primary and True Beneficiaries of the Trust .......................... 20

              b.    Disregard for formalities ............................................. 21

              c.    Bryans' Complete Dominion and Control Over the Trust .... 22

                  i.    The Scientific Cylinder "Investment ............................ 22

                  ii.    The Trust Certificate ...................................... 24

                  iii.    Personal Retention of Cash Proceeds .......................... 24

          4.    Conclusion ................................................................. 30

      B.    Plaintiff's Second Claim for Relief - Turnover - One Finch Property ......... 31

      C.    Plaintiff's Third Claim for Relief - Turnover - Range Rover Proceeds ....... 31

      D.    Plaintiff's Fourth through Eleventh Claims for Relief .................................. 31

      E.    Plaintiff's Twelfth Claim for Relief - Constructive Trust. ........................... 32

      F.    Plaintiff's Thirteenth Claim for Relief - Sale of One Finch Property ......... 34

VI.     Conclusion and Order ....................................................................... 35

i

## I.   <u>Summary</u>

This Court has previously granted Defendant's Motion for Reconsideration, which, in turn, granted Defendants' Motion for Summary Judgment on Plaintiff's Fourth through Eleventh Claims for Relief.[1]  The remaining matters before this Court are:

(a)   Plaintiff's First Claim for Relief wherein the Plaintiff seeks declaratory relief that assets of a trust are property of the estate.  The assets of the trust include certain real estate known as the One Finch Property and the proceeds of a sale of a Range Rover.

---

[1]   Docket #88 and #89.  For clarity of the discussion in this opinion, the Fourth through Eleventh Claims for relief were as follows:

(a)   The Fourth Claim for Relief was for the recovery of purported fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) as against Debtor, Mrs. Bryan, and Brad Hunt.  The Fourth Claim for Relief was pled in the alternative to the First Claim for Relief.

(b)   The Fifth Claim for Relief was for the recovery of purported fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) as against Debtor, Mrs. Bryan and Brad Hunt.  The Fifth Claim for Relief was also pled in the alternative to the First Claim for Relief.

(c)   The Sixth Claim for Relief was for the recovery of purported fraudulent transfers under 11 U.S.C. § 544(b) and COLO.REV.STAT. § 38-8-105 as against Debtor, Mrs. Bryan and Brad Hunt.  The Sixth Claim for Relief was pled in the alternative to the First Claim for Relief.

(d)   The Seventh Claim for Relief  was for the recovery of purported fraudulent transfers under 11 U.S.C. § 544(b) and COLO.REV.STAT. § 38-8-105(1)(B) as against Debtor, Mrs. Bryan and Brad Hunt.  The Seventh Claim for Relief was pled in the alternative to the First Claim for Relief.

(e)   The Eighth Claim for Relief was for the recovery of fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) as against Vectra Bank and Mrs. Bryan.  Relief was previously granted as against Vectra Bank.  However, the Court granted Defendant's Motion for Reconsideration (Docket #88 and Docket # 89) and, thus, the Motion for Summary Judgment as to the Plaintiff's claim here against Mrs. Bryan.

(f)   The Ninth Claim for Relief was for the recovery of fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) as against Vectra Bank and Mrs. Bryan.  Relief was previously granted as against Vectra Bank.  However, the Court granted Defendant's Motion for Reconsideration (Docket #88 and Docket # 89) and, thus, the Motion for Summary Judgment as to the Plaintiff's claim here against Mrs. Bryan.

(g)   The Tenth Claim for Relief was for the recovery of fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) as against Auto Source, LLC.

(h)   The Eleventh Claim for Relief was for the recovery of fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) as against Auto Source, LLC.

(b)     Plaintiff's Second Claim for Relief wherein the Plaintiff seeks turnover of the One Finch Property as property of the estate.

(c)     Plaintiff's Third Claim for Relief wherein the Plaintiff seeks turnover of the Range Rover Sales Proceeds as property of the estate.

(d)     Plaintiff's Twelfth Claim for Relief wherein the Plaintiff seeks the imposition of a constructive trust.

(e)     Plaintiff's Thirteenth Claim for Relief wherein the Plaintiff seeks authority to sell the turned over property pursuant to 11 U.S.C. §363.

As addressed herein, the Court concludes that the assets of the trust are property of the estate and, consequently, the real estate known as the One Finch Property, certain personal property, and the proceeds of the sale of the Range Rover must be turned over to the Trustee and the Court will grant him authority to sell the One Finch Property and certain personal property pursuant to 11 U.S.C. § 363.

## II.    Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and (e) and 28 U.S.C. §§ 157(b)(2)(A), (E), (H), and (N) as it involves the administration of the underlying bankruptcy estate, requests for orders to turn over property of the estate, the determination of fraudulent conveyances, and orders regarding the sale of property.

## III.    Procedural Background

Plaintiff commenced this adversary proceeding by filing his Complaint against Defendants Gary Lee Bryan, Mrs. Bryan, Vectra Bank Colorado, N.A., Auto Source, LLC, and Brad Hunt, Trustee of The Bryan Family Trust.[2]

Vectra Bank failed to timely file an answer to the Complaint. Accordingly, Plaintiff moved for entry of default and default judgment against Vectra Bank. The motion was granted on May 21, 2008 and judgment entered in favor of Plaintiff and against Vectra Bank as to the Plaintiff's Eighth and Ninth Claims for Relief in the amount of $52,001.23.

Thereafter, on December 5, 2009, the Defendants filed their Motion for Summary Judgment on Plaintiff's Fourth through Eleventh Claims for Relief.[3] In addition, Defendants also sought a Motion for Judgment on the Pleadings on the Eighth and Ninth Claims for Relief

---

[2]     When referred to collectively in this order, "Defendants" shall refer to Defendants Gary Lee Bryan, Mrs. K. Bryan, Auto Source, LLC, and Brad Hunt, Trustee of The Bryan Family Trust.

[3]     Docket #30.

on December 5, 2009.[4]  The Court denied the Motion for Summary Judgment on January 22, 2009.[5]  The Court denied the Motion for Judgment on the Pleadings on January 29, 2009.[6]

The matter was tried to the Court on April 2, 3 and 5, 2009.  Plaintiff's Exhibits 1 through 24 were admitted into evidence.  Defendants' Exhibits J, L, U and X were admitted into evidence.  Portions of Defendants' Exhibit K were admitted into evidence, as discussed in more detail herein.

Immediately prior to trial, Defendants filed a Motion to Reconsider its ruling on the Motion for Summary Judgment.[7]  A response thereto was filed by the Plaintiff on April 9, 2009.[8]  The Court granted the Motion for Reconsideration and granted the Motion for Summary Judgment as to the Fourth through Eleventh Claims asserted by the Plaintiff on May 1, 2009.[9]  The Court hereby incorporates its Order Granting Motion for Reconsideration herein.  Consequently, this Memorandum Opinion and Order only addresses the First through Third Claims for Relief and the Twelfth and Thirteenth Claims for Relief.

## IV.   Findings of Fact

Many of the following facts were stipulated to by the parties prior to trial.  Stipulated facts are identified herein by reference to the numbered joint Statement of Stipulated and Undisputed Fact ("Statement of Stipulated Facts") set forth in the parties' Joint Pretrial Statement filed on March 18, 2009.[10]  Many other facts were alleged in the Plaintiff's Complaint and admitted by Defendants in their Amended Answer filed March 2, 2009.[11]  Other factual findings are based upon exhibits admitted at trial and/or witness testimony, and are cited accordingly.

### A.   The Parties to this Action

Plaintiff M. Stephen Peters (the "Plaintiff" or  "Chapter 7 Trustee") is the duly appointed Chapter 7 trustee of the bankruptcy estate of Gary Lee Bryan, Case No. 05-38302 SBB.[12]

---

[4]   Docket #29.

[5]   Docket # 33.  The Judgment is docketed at Docket #34.

[6]   Docket #39.  The Judgment is docketed at Docket #40.

[7]   Docket #76.

[8]   Docket #82.

[9]   Docket #88 and #89.

[10]   See Docket #72.

[11]   See Docket #1 and #63.

[12]   Statement of Stipulated Facts ¶ 1.

The Debtor and Mrs. Bryan are residents of Colorado with an address of 1 Finch, Littleton, Colorado 80127.[13]

Defendant Vectra Bank Colorado, N.A. ("Vectra Bank") is a national bank doing business in Colorado.[14]

Defendant Auto Source, LLC ("Auto Source") is a Colorado limited liability company.[15]

Defendant Brad Hunt ("Mr. Hunt") is the trustee of The Bryan Family Trust.[16]

## B.     The Bankruptcy

The Debtor filed for relief under Chapter 13 of the Bankruptcy Code on October 3, 2005 (the "Petition Date").[17]  The Standing Chapter 13 Trustee, Sally Zeman, automatically was appointed as trustee under 11 U.S.C. § 1302 on the same date.[18]

On November 2, 2006, the Debtor's Chapter 13 bankruptcy case was converted to a case under Chapter 7.[19]  Plaintiff was appointed interim Chapter 7 trustee on November 2, 2006.[20] The Debtor's 11 U.S.C. § 341 meeting of creditors was not completed until February 2, 2007.[21] Under 11 U.S.C. § 702(d), the Plaintiff became permanent trustee in this case at the conclusion of the meeting of creditors.[22]

## C.     The Bryan Family Trust

On or about July 1, 1999, the Bryan Family Trust (the "Trust") was created.[23]  At the time the Trust was created, the Debtor had at least one creditor, Transamerica Accidental

---

[13]     Statement of Stipulated Facts ¶ 2.

[14]     Statement of Stipulated Facts ¶ 3.

[15]     Statement of Stipulated Facts ¶ 4.

[16]     Statement of Stipulated Facts ¶ 5.

[17]     Statement of Stipulated Facts ¶ 6.

[18]     Statement of Stipulated Facts ¶ 7.

[19]     Statement of Stipulated Facts ¶ 8.

[20]     Statement of Stipulated Facts ¶ 9.

[21]     Statement of Stipulated Facts ¶ 10.

[22]     Statement of Stipulated Facts ¶ 11.

[23]     Statement of Stipulated Facts ¶ 12.  The Trust Agreement was admitted into evidence as Plaintiff's Exhibit 1.

Insurance.[24]  On Debtor's Schedule F filed with his original bankruptcy petition, the Debtor scheduled a debt owed to Transamerica that was purportedly incurred in 1995 in the amount of $15,929.04. [25]

The Trust settlors are the Debtor and Mrs. Bryan.[26] The Trust beneficiaries are the Debtor, Mrs. Bryan and their two children: Blake Berlin Bryan and Oliver Madison Bryan.[27] The original trustee of the Trust was Robert K. Hirsch ("Mr. Hirsch").[28] Mr. Hirsch acted as an attorney for the Debtor personally and for companies owned by the Debtor for a period of 18 years.[29]

The Trust includes the following spendthrift provision:

> The interests of beneficiaries in principal or income shall not be subject to the claims of any creditor, any spouse for alimony or support, or others, or to legal process, and may not be voluntarily or involuntarily alienated or encumbered.[30]

Mr. Bryan testified that he recalled Mr. Hirsch was paid $100.00 per month for his services as trustee of the Trust.  The Trust bank records show no such payments to Mr. Hirsch.[31] The Trust bank records cover the period from June 1, 2001 through October 9, 2008.  During this seven year period, the bank records show a total of two payments made to Mr. Hirsch: one in the amount of $375.00 on June 3, 2004 and one in the amount of $350.00 on October 4, 2004.

The Trust Agreement provides for the transfer by the Debtor and Mrs. Bryan to the Trust of the "property which is listed in the attached Schedule A."[32]  Schedule A to the Trust

---

[24]   Debtor and Mrs. Bryan testified that they had no debts when the Trust was created, but other documentary evidence—Debtor's Schedule F—demonstrated that this testimony was not accurate.

[25]   Plaintiff's Exhibit 17.  In his subsequently Amended Schedule F (Plaintiff's Exhibits 18 and 20), the Debtor removed the Transamerica obligation.  However, the Debtor testified at trial that the representation in the original Schedule F was correct and he did not deny the existence of the obligation.  Moreover, while the debt was removed from Schedule F in subsequent amendments, it was not entirely omitted from the schedules.  Rather, the debt was moved to Schedule B and described in connection with the life insurance policies. (Plaintiff's Exhibit 20).

[26]   Statement of Stipulated Facts ¶ 13; Plaintiff's Exhibit 1.

[27]   Plaintiff's Exhibit 1; testimony of the Debtor and Mrs. Bryan.

[28]   Statement of Stipulated Facts ¶ 14; Plaintiff's Exhibit 1.

[29]   Testimony of Debtor.  It was eluded to at trial that Mr. Hirsch was deceased.

[30]   Plaintiff's Exhibit 1 at ¶ 3.6.

[31]   Defendants' Exhibit L.

[32]   Plaintiff's Exhibit 1.

Agreement references "One Finch, Littleton, Colorado as Furnished."[33]  On July 1, 1999, the Debtor and Mrs. Bryan did *not* own any property at One Finch, Littleton, Colorado.[34]

### D.      The One Finch Property

On June 30, 2000, the Debtor and Mrs. Bryan purchased the real property and improvements legally described as LOT 11, BLOCK 11, THE NORTH RANCH AT KEN CARYL PHASE 3, COUNTY OF JEFFERSON, STATE OF COLORADO, and known by street address as 1 Finch, Littleton, Colorado 80127 (the "One Finch Property").[35]  The Debtor and Mrs. Bryan purchased the One Finch Property for the purchase price of $755,000.00.[36]

The Debtor and Mrs. Bryan conveyed the One Finch Property to the Trust by a quitclaim deed that bears a date of January 11, 2001.  However, the quitclaim deed was signed May 3, 2001 and recorded May 9, 2001.[37]

As of January 2001, the Court finds that Debtor had at least one creditor in addition to Transamerica.  That creditor is Arthur Clark ("Mr. Clark").  The business relationship between Mr. Clark and the Debtor began in the 1990s and, by the beginning of 2001, Mr. Clark had a claim against the Debtor for damages arising out of that relationship.  Mr. Clark ultimately filed a lawsuit against the Debtor in Denver District Court in 2002 and obtained a judgment in 2004 in excess of $200,000.00.  Mr. Clark remains the Debtor's largest single creditor.[38]

The consideration received by the Debtor and Mrs. Bryan for the conveyance of the One Finch Property to the Trust is recited in the quitclaim deed as "the sum of $10 to Grantors in hand paid by Grantee, and other good and valuable consideration."[39]  At the time the One Finch Property was conveyed to the Trust, the One Finch Property was encumbered by a first deed of trust in favor of Washington Mutual Bank securing a $203,000.00 loan to the Debtor and Mrs. Bryan.  The grantors under the first deed of trust were the Debtor and Mrs. Bryan.  The Trust was not a party to the first deed of trust or the underlying loan agreement.[40]  The evidence suggests that the Trust was *never* an obligor on the underlying loan.   Based upon the purchase

---

[33]     Plaintiff's Exhibit 1.

[34]     Statement of Stipulated Facts ¶ 15.

[35]     Statement of Stipulated Facts ¶ 15.  The warranty deed conveying title to the One Finch Property  was admitted into evidence as Plaintiff's Exhibit 2.

[36]      Plaintiff's Exhibit 2.

[37]     The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 3.

[38]     Plaintiff's Exhibit 17 – Statement of Financial Affairs Question No. 4, Schedule F;  Plaintiff's Exhibits 19 & 20 – Amended Statement of Financial Affairs Question No. 4, Amended Schedule F; testimony of David Von Gunten and Debtor.

[39]     Plaintiff's Exhibit 3.  Mrs. Bryan testified that the most received was $10 and a cup of coffee.

[40]     Statement of Stipulated Facts ¶ 18.

price of $755,000.00 and the initial encumbrance of $203,000.00, the Court finds that the equity in the One Finch Property at the time of the 2001 conveyance to the Trust was $552,000.00.[41]

On June 1, 2001, the Debtor and Mrs. Bryan sold all of the "household goods and furnishings" located in the One Finch Property to the Trust for the sale price of $10.00 (hereinafter sometimes referred to as "certain personal property").[42] Mrs. Bryan testified that she did not recall receiving any more than $10.00 for the transfer of the household goods and furnishings to the Trust. The Debtor has not purchased any household goods and furnishings since the June 1, 2001 sale to the Trust.[43]

Despite the purported transfer of "household goods and furnishings" in 2001 and his testimony that he did not purchase any such goods after the purported transfer, the Debtor scheduled "household goods and furnishings" at a value of $1,920.00 in Schedule B to his Voluntary Petition,[44] his amended Schedule B filed August 28, 2007,[45] and his amended Schedule B filed December 10, 2007.[46]

### E.     The Leases

Mrs. Bryan, as lessee, and the Trust, as lessor, entered a "Residence Lease" whereby the Trust leased the One Finch Property to Mrs. Bryan. The Residence Lease is dated June 1, 2001.[47] The monthly rent under the 2001 Residence Lease was $1,920.87.[48]

---

[41]     No evidence was offered at trial regarding the current value of the One Finch Property or, for that matter, its value at any time since the purchase. In addition, no evidence was offered to suggest the One Finch Property had either appreciated or depreciated since the purchase. Plaintiff alleged in his Complaint that the One Finch Property was worth $750,000.00 on the Petition Date. *See* Complaint ¶ 145. Defendants denied the allegations regarding value in their Amended Answer but offered no contrary evidence at trial. *See* Amended Answer, at ¶ 145. The precise number is not critical to the Court's findings. Therefore, for purposes of this Order, the Court will treat the purchase price of $755,000.00 as the value from 2001 through the Petition Date. This valuation does not specifically account for or include value accruing to the One Finch Property by way of appreciation since 2001, and by the substantial renovation and improvements conducted on the home.

[42]     Complaint, at ¶ 26. Defendants did not respond to the allegations of paragraph 26 of the Complaint and the allegations are therefore deemed admitted under Rule 8(b)(6)

[43]     Testimony of Debtor.

[44]     Plaintiff's Exhibit 17.

[45]     Plaintiff's Exhibit 19.

[46]     Plaintiff's Exhibit 20.

[47]     A copy of the 2001 lease was admitted into evidence as part of Defendants' Exhibit J.

[48]     Defendants' Exhibit J.

The Trust bank records reveal that there was never a deposit made to the Trust in the amount of $1,920.87.[49]  Rather, after an initial deposit of $3,000.00, deposits in the amount of either $2,000.00 or $2,500.00 were made to the Trust bank account during 2001 and 2002. The monthly payments to the Trust were made to cover the Bryans' individual and personal monthly mortgage obligations to Washington Mutual Bank.[50]

The Debtor and Mrs. Bryan, as lessees, and the Trust, as lessor, entered a second "Lease Agreement" dated May 5, 2005 whereby the Trust leased the One Finch Property to the Debtor and Mrs. Bryan.[51]   The monthly rent under the 2005 Residence Lease was $3,277.00.[52]

The Trust bank records reveal that there was never a deposit made to the Trust in the amount of $3,277.00.[53]  Rather, beginning March 8, 2005 and continuing through October 9, 2008, deposits ranging in amount from $100.00 to $4,357.78 were made to the Trust bank account.  In addition, the first month in which the total amount of deposits even exceeded $3,000.00 was December 2005.

The only reference to the Trust in the Debtor's original bankruptcy filing was on Schedule G as the lessor of the One Finch Property.[54]   Neither the real property interest at the One Finch Property, nor the Trust interest of the Debtor were listed as assets of the Debtor in the original Schedules.  On November 10, 2005, despite being a party to the May 5, 2005 lease, the Debtor filed an amended Schedule G deleting the reference to the Trust.[55]

### F.    The February 2003 Refinance

On February 21, 2003, the Trust conveyed the One Finch Property back to the Debtor and Mrs. Bryan by quitclaim deed.[56]  Contemporaneously therewith, on February 21, 2003, the Debtor and Mrs. Bryan refinanced the One Finch Property through Washington Mutual Bank. The existing obligation in the amount of $200,403.17 was paid with the proceeds of a new loan in the amount of $250,000.00.[57]

---

[49]     Defendants' Exhibit L.

[50]     Testimony of Mrs. Bryan.

[51]     A copy of the 2005 lease was admitted into evidence as part of Defendants' Exhibit J.

[52]     Defendants' Exhibit J.

[53]     Defendants' Exhibit L.

[54]     Statement of Stipulated Facts ¶ 19.

[55]     Statement of Stipulated Facts ¶ 20.

[56]     The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 4.

[57]     Complaint and Amended Answer respectively at ¶ 31.  The settlement statement from the refinance was admitted into evidence as Plaintiff's Exhibit 5.

The borrowers under the new promissory note and grantors under the new first deed of trust were again the Debtor and Mrs. Bryan, individually. The Trust was not a party to the first deed of trust or the underlying loan agreement.

The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer that the Debtor and Mrs. Bryan received physical possession of the proceeds from the February 21, 2003 refinance in the amount of $46,168.15.[58] However, the Court finds, based upon the undisputed testimony of the Debtor and Mrs. Bryan at trial, that only Mrs. Bryan received possession of the cash proceeds from the February 21, 2003 refinance.

The Trust received none of the cash proceeds of the February 21, 2003 refinance.[59] This finding is further supported by the absence of any deposits in an amount close to $46,168.15 into the Trust bank account at any time.[60] As a result of the increase in the indebtedness secured by the One Finch Property from $200,403.17 to $250,000 after the February 21, 2003 refinance, the Court finds the equity in the One Finch Property after the refinance was reduced to $505,000.00. After the refinance, on February 21, 2003, the Debtor and Mrs. Bryan re-conveyed the One Finch Property to the Trust by quitclaim deed.[61]

## G.     The Scientific Cylinder Transaction

On June 16, 2003, the Debtor borrowed $250,000.00 from Vectra Bank.[62] On June 16, 2003, the Trust granted Vectra Bank a second deed of trust against the One Finch Property to secure the Debtor's personal repayment obligations to the bank.[63]

In connection with the June 16, 2003 loan, Mr. Hirsch executed a Trust Certificate.[64] The Trust Certificate provides the trustee of the Trust *unlimited* authority to pledge any and all Trust assets as security for *any* indebtedness of *Debtor*.[65]

Contrary to the Debtor's testimony at trial that he believed the Trust Certificate applied only to the June 16, 2003 financing, the Certificate states in clear and unambiguous language at

---

[58]     Complaint and Amended Answer ¶ 32; Plaintiff's Exhibit 5.

[59]     Complaint and Amended Answer ¶ 33; testimony of Mrs. Bryan.

[60]     Defendants' Exhibit L.

[61]     Complaint and Amended Answer ¶ 34. The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 6.

[62]     Complaint and Amended Answer ¶ 35.

[63]     Complaint and Amended Answer ¶ 36.

[64]     Complaint and Amended Answer ¶ 37. The Trust Certificate was admitted into evidence as Plaintiff's Exhibit 7.

[65]     Plaintiff's Exhibit 7, at "Actions Authorized" (emphasis added).

the top that the references in the document to the June 16, 2003 financing "are for Lender's use only and do not limit the applicability of this document to any particular loan or item."[66]  The Trust Certificate provides that it "shall be continuing, shall remain in full force in effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender. . ."[67]  The Trust Certificate has never been revoked.[68]

The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer that the Debtor used the proceeds of the June 16, 2003 loan to make a $250,000.00 loan to Scientific Cylinder Corporation.[69]  However, Debtor's testimony at trial was more equivocal.  He testified that he thought the loan was made to a related entity—Scientific Cylinder International—and not Scientific Cylinder Corporation.

In his most recent amended Statement of Financial Affairs, in response to Question Number 20 regarding names of businesses in which the debtor is or was affiliated in the six years before the Petition Date, the Debtor attached an "Exhibit A" listing thirty-three (33) such entities.[70]  In the "Exhibit A" to his amended Statement of Financial Affairs, the Debtor claims to have been a Secretary/Member of Scientific Cylinder International "for a short time."[71]  He also describes the beginning and end dates of Scientific Cylinder International as "September 2002 to unknown."[72]

In the "Exhibit A" to his amended Statement of Financial Affairs, the Debtor also claims to have been a registered agent of Scientific Cylinder Corporation "for 1 year."  He describes the beginning and end dates for Scientific Cylinder Corporation as "August 2000—present status, voluntarily dissolved." [73]

The Debtor testified that he invested in numerous business opportunities between 1999 and the filing of his bankruptcy petition, but the Scientific Cylinder transaction was the only financial deal he directed to be made through the Trust.  The Debtor further testified that he reviewed financial information and believed the Scientific Cylinder transaction to be sound when it was made.

The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer that "on July 18, 2003, the Debtor assigned all his right, title and interest in

---

[66]     Plaintiff's Exhibit 7.

[67]     Plaintiff's Exhibit 7 at "Continuing Validity".

[68]     Complaint and Amended Answer ¶ 37; testimony of Debtor.

[69]     Complaint and Amended Answer at ¶ 38.

[70]     Plaintiff's Exhibit 20.

[71]     *Id.*

[72]     *Id.*

[73]     *Id.*

the SC Note to the Trust."[74]  Again, the testimony of Mr. Bryan at trial was more equivocal.  He denied the existence of a note made payable to him and stated that any note was directly between the Trust and the borrowing Scientific Cylinder entity.

Despite Mr. Bryan's testimony that he believed Scientific Cylinder was a sound "investment," the Trust never received a single payment on the note from the Scientific Cylinder entity.[75]  As a result of the increase in the indebtedness secured by the One Finch Property from $250,000.00 to $500,000.00 after the June 16, 2003 financing, the Court finds the equity in the One Finch Property after said financing was reduced from $505,000.00 to $255,000.00.

### H.    The January 25, 2005 Refinance

On January 25, 2005, the Trust conveyed the One Finch Property back to Mrs. Bryan alone by quitclaim deed.[76]  On January 25, 2005, the loans secured by liens against the One Finch Property were refinanced through Vectra Bank.  The first deed of trust to Washington Mutual Bank in the amount of $245,896.83 and the second deed of trust to Vectra Bank in the amount of $255,930.55 were satisfied with the proceeds of a new loan in the amount of $560,000.00.[77]

The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer that the borrower under the new promissory note and grantor under the new first deed of trust was Mrs. Bryan.[78]  At trial, both the Debtor and Mrs. Bryan testified that the Debtor was not a party to the January 25, 2005 refinance.

However, the Court admitted into evidence Defendants' Exhibit U which is a copy of a deed of trust granted by both the Debtor and Mrs. Bryan in connection with the January 25, 2005 refinance.  Both the Debtor and Mrs. Bryan acknowledged their signatures on Defendants' Exhibit U.  The promissory note evidencing the debt that is referenced in Defendants' Exhibit U was not offered into evidence.  Nevertheless, Defendants' Exhibit U provides that the "Borrower" under the loan "is Mrs. Bryan and Gary K. Bryan."  Defendants' Exhibit U further provides that the "Borrower" under the deed of trust is also the "Borrower" under the promissory note.

The Debtor and Mrs. Bryan warranted to Vectra Bank in the January 2005 deed of trust that "Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property . . ."

Based upon Defendants' Exhibit U, the Court finds that the Debtor was a party to the

---

[74]    Complaint and Amended Answer at ¶ 39.

[75]    Complaint and Amended Answer at ¶ 40; testimony of Debtor.

[76]    The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 8.

[77]    Statement of Stipulated Facts ¶ 22.

[78]    Complaint and Amended Answer at ¶ 42; Statement of Stipulated Facts ¶ 22.

11

January 2005 refinance insofar as he (a) agreed to be bound by the indebtedness to Vectra Bank arising from said refinance and (b) granted Vectra Bank a security interest in the One Finch Property to secure repayment of said indebtedness in the amount of $560,000.00.

The January 2005 deed of trust conveyance was made within one year of the Petition Date.

In addition to denying at trial any participation in the January 2005 refinance, the Debtor never disclosed in his original or amended bankruptcy filings any transfers or property interests relating to the refinance.[79]  The Trust was not a party to the January 2005 deed of trust conveyed to Vectra Bank or the underlying loan agreement.[80]

On January 21, 2005, Mrs. Bryan represented in writing that the purpose for the refinance was as follows:

(a)     Payoff Vectra Bank loan in the name of my husband Gary for $255,576

(b)     Payoff misc. credit cards that I have.

(c)     Remaining money will be used for small home improvements and will be invested.[81]

Mrs. Bryan received cash proceeds from the January 2005 refinance in the amount of $49,002.45.[82]  The Debtor received none of the cash proceeds from the January 2005 refinance.[83]

The Trust received none of the cash proceeds of the January 2005 refinance.[84]  This finding is further supported by the absence of any deposits in an amount close to $49,002.45 into the Trust bank account at any time.[85]  As a result of the increase in the indebtedness secured by the One Finch Property to $560,000.00 after the January 2005 refinance, the Court finds the equity in the One Finch Property after said refinance was reduced to $195,000.00.

---

[79]     Plaintiff's Exhibits 17-20.

[80]     Statement of Stipulated Facts ¶ 22; Defendants' Exhibit U.

[81]     Statement of Stipulated Facts ¶ 23.  A copy of the writing was admitted into evidence as Plaintiff's Exhibit 10.

[82]     Statement of Stipulated Facts ¶ 24; testimony of Mrs. Bryan. The settlement statement from the refinance was admitted into evidence as Plaintiff's Exhibit 9.

[83]      Testimony of Debtor; testimony of Mrs. Bryan.

[84]     Statement of Stipulated Facts ¶ 25; testimony of Mrs. Bryan.

[85]     Plaintiff's Exhibit L.

After the refinance, on January 31, 2005, Mrs. Bryan re-conveyed the One Finch Property to the Trust by quitclaim deed.[86]

On May 11, 2005, Mrs. Bryan wrote a letter to Mr. Hirsch describing "recent financial transactions the Trust has approved."[87]  In the May 11, 2005 letter, Mrs. Bryan describes the "main purpose" of the January 2005 refinance as follows: "to remove the second deed of trust held by Vectra Bank."  Mrs. Bryan describes no other purposes for the January 2005 refinance.

## I.      The May 9, 2005 Home Equity Line of Credit

On May 9, 2005, the Trust again conveyed the One Finch Property back to the Debtor and Mrs. Bryan by quitclaim deed.[88]  Also, on May 9, 2005, a home equity line of credit (the "HELOC") was obtained from Vectra Bank with a draw limit of $55,000.00.[89]  Defendants asserted prior to trial that the HELOC was obtained by only Mrs. Bryan.[90]

At trial, both the Debtor and Mrs. Bryan testified that the Debtor was not a party to the HELOC.  However, the Court admitted into evidence Defendants' Exhibit X which is a copy of a deed of trust granted by both the Debtor and Mrs. Bryan in connection with the HELOC.  Both the Debtor and Mrs. Bryan acknowledged their signatures on Defendants' Exhibit X.  The HELOC "Agreement and Disclosure Statement" evidencing the HELOC that is referenced in Defendants' Exhibit X was not offered into evidence.  Nevertheless, Defendants' Exhibit X provides that the "Borrower" under the loan "is Mrs. Bryan and Gary K. Bryan."  Defendants' Exhibit X further provides that the "Borrower" under the deed of trust is also the "Borrower" under the HELOC agreement.[91]

The Debtor and Mrs. Bryan warranted to Vectra Bank in the May 2005 deed of trust that "Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property . . ."[92]

Based upon Defendants' Exhibit X, the Court finds that the Debtor *was* a party to the HELOC insofar as he (a) agreed to be bound by the indebtedness to Vectra Bank arising from said financing and (b) granted Vectra Bank a security interest in the One Finch Property to secure repayment of said indebtedness in the amount of $55,000.00.

---

[86]    Statement of Stipulated Facts ¶ 26.  The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 11.

[87]    A copy of the letter was admitted into evidence as Plaintiff's Exhibit 16.

[88]    The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 12.

[89]    Statement of Stipulated Facts ¶ 28.

[90]    *Id.*

[91]    Defendants' Exhibit X (at "Uniform Covenant" No. 1, page 3).

[92]    Defendants' Exhibit X (at page 2).

The May 2005 deed of trust conveyance was made within one year of the Petition Date.

In addition to denying at trial any participation in the HELOC transaction, the Debtor never disclosed in his original or amended bankruptcy filings any transfers relating to the HELOC or property interests resulting from the related conveyances.[93]  The Trust was not a party to the May 2005 deed of trust conveyed to Vectra Bank or the underlying loan agreement.[94]  The closing of the HELOC transaction occurred on May 9, 2005.[95]  After the closing of the HELOC on May 9, 2005, the Debtor and Mrs. Bryan re-conveyed the One Finch Property to the Trust by quitclaim deed.[96]

On May 10, 2005, the day *after* the closing on the HELOC, Mr. Hirsch gave his written approval for the Bryans to obtain the HELOC and secure their repayment obligations by granting a lien against the One Finch Property.[97]  Mr. Hirsch approved the HELOC "for the reason that the Line of Credit will generate cash for The Bryan Family Trust."[98]

In her May 11, 2005 letter to Mr. Hirsch describing "recent financial transactions the Trust has approved," Mrs. Bryant stated the following with respect to the HELOC:

> The line of credit loan is in the amount of $55,000.00, with an interest rate of 6.75% per annum.  Since this loan was just closed on Monday, May 9, 2005, the funds have not yet been distributed.  The plan is to provide a line of credit for Auto Source, LLC to expand its inventory.  Initially, Auto Source will be charged 9% for its use of the line of credit funds.[99]

Auto Source is an auto brokerage company in Denver.  Both the Debtor and Mrs. Bryan work as independent contractors for Auto Source.  Neither is a member or manager of the company.[100]  No representative from Auto Source appeared or testified at trial.

No written line of credit agreement between the Bryans and Auto Source corresponding to the purported agreement mentioned in the May 11, 2005 letter was offered or admitted into

---

[93]   Statement of Stipulated Facts Nos. 30, 34; Plaintiff's Exhibits 17-20.

[94]   Defendants' Exhibit X.

[95]   The settlement statement from the refinance describing the closing date was admitted into evidence as Plaintiff's Exhibit 15.

[96]   Statement of Stipulated Facts ¶ 29.  The quitclaim deed was admitted into evidence as Plaintiff's Exhibit 13.

[97]   A copy of the written approval was admitted into evidence as Plaintiff's Exhibit 14.

[98]   Plaintiff's Exhibit 14.

[99]   Plaintiff's Exhibit 16.

[100]   Testimony of Debtor; testimony of Mrs. Bryan.

evidence. No representative from Auto Source testified regarding the existence of any line of credit agreement.

On May 13, 2005, Mrs. Bryan received cash proceeds from the HELOC in the amount of $53,969.00.[101] The Debtor received none of the cash proceeds from the HELOC.[102] The Trust received none of the cash proceeds of the HELOC.[103] This finding is further supported by the absence of any deposits in an amount close to $53,969.00 into the Trust bank account at any time.[104] As a result of the increase in the indebtedness secured by the One Finch Property to $615,000.00 after the HELOC disbursement, the Court finds the equity in the One Finch Property after said refinance was reduced to $140,000.00.

On June 27, 2005, $25,000.00 was transferred from a Citywide Bank account in Mrs. Bryan's name to Auto Source.[105]

### J.    The 2003 Range Rover

In 2002, the Trust purchased a 2003 Range Rover motor vehicle, VIN SALME11483A134756 (the "Range Rover").[106] The purchase price of the Range Rover was paid through a combination of cash from the Debtor and trade-in credit received from two other vehicles owned by the Debtor.[107] The Trust held title to the Range Rover.[108]

The Range Rover was purportedly stolen in 2003, but subsequently recovered in Hempstead, New York and later returned to the Trust.[109] The Range Rover's VIN tags were removed during the period it was reported as stolen.[110]

---

[101]    Statement of Stipulated Facts ¶ 33; Plaintiff's Exhibit 15; testimony of Mrs. Bryan.

[102]    Testimony of Debtor; testimony of Mrs. Bryan.

[103]    Statement of Stipulated Facts ¶ 35; testimony of Mrs. Bryan.

[104]    Defendants' Exhibit L .

[105]    Statement of Stipulated Facts ¶ 37.

[106]    Statement of Stipulated Facts ¶ 38.

[107]    Statement of Stipulated Facts ¶ 39; testimony of Debtor.

[108]    Statement of Stipulated Facts ¶ 40.

[109]    Statement of Stipulated Facts ¶ 41.

[110]    Statement of Stipulated Facts ¶ 42.

Auto Source subsequently sold the Range Rover two times but each sale later was unwound.[111] In June 2006, the Range Rover was sold a third time by Auto Source for the sale price of $30,488.[112]

The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer (filed less than one month before trial) that Auto Source was holding the sale proceeds of $30,488 pending resolution of the purported VIN tag issue.[113]  At trial, Mr. Bryan testified that the funds were placed into an Auto Source operating account, not a separate escrow, and that the company no longer had the funds.

### K.    Credibility of Witnesses

Other than the Chapter 7 Trustee, there were only two material witnesses called at trial, the Debtor and his wife, Mrs. Bryan.  For the many reasons identified herein, and as illustrated in numerous situations described herein, the Court finds that neither the Debtor nor Mrs.Bryan were credible witnesses.  Their testimony was impeached often and significantly, and their stories and explanations were laced with inconsistencies, conflicting evidence and a pattern of evasion.

It is also not unimportant to also recognize that both the Debtor and Mrs. Bryan impress the Court as smart, savvy, articulate and able persons.  Particularly the Debtor; he is without doubt, a sophisticated, business-wise, experienced and very creative individual.

## V.    Discussion

### A.    Plaintiff's First Claim for Relief – Declaratory Relief – Trust Assets are Property of Estate

The primary relief sought by the Chapter 7 Trustee is a declaration that the Trust assets are property of the estate because the Trust is invalid or void under state law.

### 1.    11 U.S.C. § 541

The starting point for the validity analysis is 11 U.S.C. § 541(a)(1) which describes the scope of estate property.  As this Court stated in a prior decision, "[t]he estate created when the Debtor filed his Petition in bankruptcy is broad and encompassing."[114]  The estate "embraces all

---

[111]     Statement of Stipulated Facts ¶ 43; testimony of Debtor.

[112]     Statement of Stipulated Facts ¶ 44; testimony of Debtor.

[113]     Amended Answer ¶ 65.

[114]     *In re Alagna*, 107 B.R. 301, 307 (Bankr.D.Colo. 1989).

'legal and equitable interests of the debtor ... as of commencement of the case ...' and includes, at least initially, virtually all non-exempt and exempt property."[115]

One exception to the "sweeping scope" of the definition of property of the estate is 11 U.S.C. § 541(c)(2).[116]  Section 541(c)(2) provides as follows: "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable under" the Bankruptcy Code.  As stated in *Alagna*,

> This section preserves restrictions on the transfer of a beneficial interest of a debtor in a trust which is enforceable under applicable nonbankruptcy law.  By preserving the restrictions, the interest in the trust is not included in the property of the estate.  Stated simply, trust funds with proper and legally sufficient restraints on transfers and alienation will be excepted from being deemed property of the estate.
>
> The substantial majority of courts have concluded that the reference in Section 541(c)(2) to 'applicable nonbankruptcy law' means that *only* trusts enforceable under state law as spendthrift trusts are excepted and excluded from the assets of a bankruptcy estate.[117]

The inquiry as to whether the Trust assets are property of the estate thus turns on whether the Trust, under Colorado state law, is a valid and enforceable "spendthrift trust."  If not, all of the Debtor's interest in Trust assets is property of the bankruptcy estate.

2.      Colorado Spendthrift Trusts

Under Colorado law, spendthrift trusts are valid provided certain requirements are met.[118]  In *Matteson*, the court outlined three characteristics of a valid spendthrift trust in Colorado.  Those characteristics were relied upon by this Court in *Alagna* and described therein as follows:

1.      A spendthrift trust is one which by the terms of the trust, restrains the voluntary or involuntary transfer of the beneficiary's interest;

2.      A spendthrift trust which names the settlor as beneficiary is invalid; and

---

[115]    *Id.* (citing *U.S. v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d. 515 (1983) and *In re Matteson*, 58 B.R. 909 (Bankr. D.Colo. 1986)).

[116]    *Id.*

[117]    *Id.* at 307 (internal citations omitted; emphasis in original).

[118]    *See, e.g. Brasser v. Hutchison*, 549 P.2d 801 (Colo. 1976);  *Matteson*, 58 B.R. at 911.

3.    The operative issue is the extent of dominion and control a
beneficiary possesses over the trust corpus.[119]

The court in *Matteson*, in turn, based its conclusions, in part, upon the common law of trusts,
which provides that "a spendthrift trust which names the settlor as beneficiary is invalid."[120]  The
*Alagna/Matteson* analysis remains good law.  In *In the Matter of Cohen*, the Colorado Supreme
Court stated that a spendthrift trust where the settlor is also a beneficiary cannot "protect the
settlor-beneficiary from future creditors."[121]  As support for this conclusion, the Colorado
Supreme Court cites to the Restatement (Second) of Trusts § 156 (1959) which provides as
follows:

> Where a person creates for his own benefit a trust with a provision
> restraining the voluntary or involuntary transfer of his interest, his
> transferee or creditors can reach his interest.

The court continued:

> Even in jurisdictions in which spendthrift trusts are permitted, the
> settlor cannot create a spendthrift trust for his own benefit.  If the
> owner of property transfers it in trust to pay the income to himself
> for life or for a period of years, and provides that his interest under
> the trust shall not be assignable by him and that his creditors shall
> not be permitted to reach it, *nevertheless he can effectively assign
> his interest and his creditors can reach it.*  It is immaterial that in
> creating the trust the settlor did not intend to defraud his creditors.
> . . . It is against public policy to permit a man to tie up his own
> property in such a way that he can still enjoy it but can prevent his
> creditors from reaching it.[122]

Based upon all of the foregoing, it would appear beyond doubt that, under Colorado law, a
spendthrift trust, which names the settlor as a beneficiary, is invalid.

Here, the Trust contains a spendthrift provision.[123]  In addition, the Trust Agreement was
settled by the Debtor and Mrs. Bryan.  The agreement plainly and unambiguously names the
Debtor as a beneficiary.  Based upon the Colorado law of spendthrift trusts recited above, the
Court need not necessarily address the third factor regarding dominion and control set forth in

---

[119]    *Alagna*, 107 B.R. at 308 (*citing Matteson*, 58 B.R. at 911).

[120]    *Matteson*, 58 B.R. at 911 (*citing* G. Bogert, *Law of Trusts and Trustees,* rev. 2d ed. § 223, pp. 438-439
(1979)).

[121]    8 P.3d 429, 434 (Colo. 1999).

[122]    *Cohen*, 8 P.3d at 433 (*quoting William F. Fratcher, IIA Scott on Trusts § 156, at 164-67 (4th ed.1987)*)
(emphasis added in *Cohen*).

[123]    *See* Plaintiff's Exhibit 1, at ¶ 3.6.

*Alagna* and *Matteson*; the Trust is invalid for the simple reason that it is a spendthrift trust in which the Debtor is both a settlor and a beneficiary.

At trial, Defendants asserted that the validity of the Trust is governed by COLO.REV.STAT. § 38-10-111. Section 38-10-111 provides:

> All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels, or things in action, or real property, made in trust for the use of the person making the same shall be void as against the creditors existing of such person."

As further support for their position, the Defendants rely upon *In re Baum*,[124] a Tenth Circuit decision applying COLO.REV.STAT. § 38-10-111.

Defendants' reliance upon § 38-10-111 is misplaced for two reasons. First, COLO.REV.STAT. § 38-10-111 is *not* determinative of the issues in dispute. This conclusion is based upon the analysis set forth in *Cohen*, discussed above. In *Cohen*, the court held that COLO.REV.STAT. § 38-10-111 does not control determination of the validity of spendthrift trusts and implicitly criticized the *Baum* result:

> Cohen assumes that section 38-10-111 only applies to creditors of the settlor-beneficiary at the time the trust is created. *See In re Baum*, 22 F.3d 1014, 1017 (10th Cir.1994) (construing section 38-10-111 to apply only to creditors existing at time trust was created). The complainant makes the same assumption, but concludes that while the trust may not be valid as to creditors, it is not thereby void. *But even if there were no creditors at the time the trust was settled, the oral irrevocable spendthrift trust could not and did not protect the settlor-beneficiary from future creditors. See* Restatement (Second) of Trusts § 156; IIA *Scott on Trusts, supra,* § 156, at 164-67.[125]

Second, even if the Court were to find COLO.REV.STAT. § 38-10-111 controlling, the statute provides no lifeline to the Defendants. The Court has found that the Debtor had creditors existing at the time the Trust Agreement was initially prepared (Transamerica) and at the time the One Finch Property was first conveyed to the Trust (Mr. Clark). Thus, even if the Court were to find COLO.REV.STAT. § 38-10-111 controlling, the Court would be left with the conclusion that the initial conveyance of the One Finch Property to the Trust is void. Moreover, the One Finch Property was conveyed back and forth between the Trust and the Bryans at least four times between 2001 and 2005. It is undisputed that at the time of the first of those transfers,

---

[124]    22 F.3d 1014 (10th Cir. 1994).

[125]    *Cohen*, 8 P.3d at 433. At trial, in denying the Defendants' oral motion for a directed verdict, the Court further distinguished the *Baum* case, on its facts, from the instant dispute. Those findings were stated on the record in open court and are incorporated herein by reference. *See also Alagna*, 107 B.R. at 313 (concluding COLO.REV.STAT. § 38-10-111 merely creates presumption of fraud without having to prove intent and is not dispositive as to validity of spendthrift trusts).

19

in February 2003, Mr. Clark was a creditor of the Debtor.  If COLO.REV.STAT. § 38-10-111 controls, each time the Debtor quitclaimed his interest in the One Finch Property back to the Trust, he was making a conveyance that was void as against his creditors.[126]

The Court concludes the Trust is void or unenforceable under Colorado law because the Trust is an invalid spendthrift trust that names the settlor, the Debtor, as one of the beneficiaries.

3.    "Sham" Trusts

Next, the Court will address the "dominion and control" factor in *Alagna* and *Matteson*. The extent of a debtor's control over a trust bleeds into the analysis of whether the trust is unenforceable as against public policy or a "sham trust."  In *Baum*, the Tenth Circuit referenced some of the criteria used in determining whether a trust is a sham trust: "when a person in a position analogous to debtor here retains too much control over transferred property, ignores legal formalities, and uses the property as his own, the property is treated as owned by the transferor rather than the entity that is the nominal owner."[127]  This Court in *Alagna* relied upon some of the same criteria:

> To qualify as a spendthrift trust it is appropriate and necessary that the trust instrument contain articulated spendthrift provisions and the trust be administered in a correct and legally sufficient manner. If the provisions, administration and integrity of a spendthrift trust are disregarded, so too will its status as a special, protected asset of the Debtor.[128]

Here, the evidence regarding dominion and control, disregard for formalities and, ultimately, a disregard for the existence of a trust entity separate and apart from the Bryans is overwhelming.

a.    The Primary and True Beneficiaries of the Trust are the Debtor and Mrs. Bryan

The starting point for this analysis is the disconnect between the purported purpose of the Trust and the evidence regarding its operations.  The Debtor testified that the Trust was created for the health, education and welfare of his two minor children.  He also testified that in his mind there was no means under the Trust Agreement for he or Mrs. Bryan to receive any of the trust property or, stated somewhat differently, to receive any of the benefits of the Trust.  Both assertions are diametrically opposed to the Trust in operation.

---

[126]    *See* Plaintiff's Exhibits 6 & 13.

[127]    22 F.3d at 1018.

[128]    107 B.R. at 308; *see also id.* at 313 ("all the indicia of ownership, authority, control, administration, and benefit, must be taken together and measured to determine whether or not the trust can be legitimately and fairly deemed a spendthrift trust under state law"); *Matteson*, 58 B.R. at 911 (restrictions on spendthrift trusts "ensure that although an individual can set up a trust to provide for the welfare of another, he cannot *control his assets* to defraud his creditors.") (emphasis added).

20

First, the Bryans' children have never benefitted from the existence of the Trust. The Debtor testified (and the Trust bank records at Defendants' Exhibit L corroborate) that no Trust property has ever been distributed to the children. Moreover, their beneficial interest has been steadily whittled away since the Trust's creation to the point that the value to the children of the One Finch Property has gone from $500,000.00 to $140,000.00, a reduction of almost seventy-five percent (75%). Thus, not only have the children seen no distributions from the multiple cash outs, but the amount potentially available for distribution—the equity—was reduced during the period in question by nearly seventy-five percent (75%).

The lack of benefit to the children is further shown by the history and use of the Range Rover.[129] It is curious that the Debtor and Mrs. Bryan have never pushed Mr. Hirsch or the successor trustee, Mr. Hunt, to try to recover from Auto Source the $30,488 in proceeds from the sale of the Range Rover, despite the fact the Range Rover was sold in 2006. If the Range Rover was a Trust asset, and intended to benefit the children, it makes no sense that neither the parents nor the trustees would make any effort to recover this significant amount of money.

Second, the true beneficiaries since the inception of the Trust have been the Debtor and Mrs. Bryan. The Debtor and/or Mrs. Bryan received *all* of the cash proceeds—totaling nearly $150,000.00—from the two refinances and the HELOC. As discussed in more detail below, the Debtor was able to use the One Finch Property as security for his personal loan of $250,000.00 to one of the Scientific Cylinder entities. Mr. Bryan had the use for at least one year of the Range Rover. In creating the Trust, Mr. Bryan received the additional benefit of keeping his considerable non-exempt assets out of the reach of creditors from 2000 through 2005. *All* of the benefits of this Trust inured to the Debtor and his wife. This is precisely the reason "i[t] is against public policy to permit a man to tie up his own property in such a way that he can still enjoy it but can prevent his creditors from reaching it."[130]

### b.    Disregard for Formalities

In addition to the lack of any benefits seen by the purported beneficiaries, the evidence clearly demonstrates a disregard for any formalities whatsoever in the administration of the Trust. Indeed, with the exceptions that (a) a written trust agreement existed; (b) a trustee for the Trust has always existed; and (c) the Trust maintained a bank account, there is no distinction between the Trust and the Bryans' personal affairs. The only written trust records produced were the leases at Defendants' Exhibit J and the Trust bank records at Defendants' Exhibit L. There was no written authorization for the February 2003 or January 2005 refinance. Mr. Hirsch's authorization for the HELOC is dated two days after the loan closed. There is no written resignation letter from Mr. Hirsch. No records were produced regarding what household goods and furnishings were purchased after June 1, 2001, making it impossible to determine what goods and furnishings are Trust property and what goods and furnishings are personal or marital property.

---

[129]    Debtor asserted that one of the benefits for the children of titling the Range Rover in the Trust was that the children had the benefit of riding in a vehicle with their father. The Court finds this assertion to be not credible. Nor is this assertion particularly compelling, even if true.

[130]    *Cohen*, 8 P.3d at 433.

21

Disregard for the formalities is also shown by the selection of trustees: first, Mr. Hirsch, an attorney who provided various legal services to Mr. Bryan and his company for 18 years (including one or both of the Scientific Cylinder entities) could not have been disinterested. The successor trustee is Mrs. Bryan's brother. In over four years of service, Mr. Hirsch received a total of just $725.00 in two payments for his services.[131] Mr. Hunt has never received any payments.[132] Trust bank records were mailed to Mrs. Bryan's company for a period of time, not to Mr. Hirsch.[133] During the four years between the initial conveyance to the Trust and the Petition Date, there were only two leases of the One Finch Property back to the Bryans.[134] There is no correspondence between the monthly lease payments in the two leases and the monthly deposits made into the Trust bank accounts.[135] The Trust bank records reveal five payments to Auto Source in 2004 in the total amount of $12,500.[136] No explanation was given as to the reasons why these purported Trust funds were distributed to Auto Source. There has simply been a complete disregard for any legal or administrative formalities in the operation of the Trust.

c.    <u>The Bryans' Complete Dominion and Control Over the Trust and Identity of Interest</u>

The Bryans' dominion and control over the Trust and lack of any distinction between the Bryans' personal affairs and the Trust entity are shown by numerous facts. Before addressing specific facts it bears mentioning that, although it was suggested that Mr. Hirsch passed away, still neither trustee nor any other person was called to testify on this issue. The trustees are the persons best situated to testify as to whether the Bryans exercised complete dominion and control over the Trust and its purported assets. No one else would possess such knowledge. The *only* testimony regarding dominion and control was offered by the Bryans and, for the reasons discussed below, the Court gives little weight to that testimony. This silence, coupled with the evidence that the Bryans used the One Finch Property as a personal bank during the period 2001 through 2005, certainly adds weight to Court's conclusion that the Bryans exercised complete dominion and control over the Trust.

i.    The Scientific Cylinder "Investment"

The Debtor's dominion and control over the Trust and identity of interest is shown first by the Scientific Cylinder "investment." Very little documentary evidence regarding the "investment" was offered into evidence and the nature of the deal is murky, at best. The Debtor testified that, based upon his advice, the Trust agreed to take on a $250,000.00 liability in a

---

[131]    *See* Defendants' Exhibit L.

[132]    *See id.*

[133]    *See id.*

[134]    *See* Defendants' Exhibit J.

[135]    *See* Defendants' Exhibits J & L.

[136]    *See* Defendants' Exhibit L.

company (one of the Scientific Cylinder entities) in which the Debtor held an ownership or management stake and for which the trustee at the time, Mr. Hirsch, provided legal services. While the Debtor claimed the "investment" was sound and looked good on paper, it is undisputed that the Trust never received any repayment whatsoever.

Based upon the Debtor's admissions and testimony, the evidence makes it appear more likely than not that the "investment" was merely a means of satisfying a large *personal* obligation of the Debtor. The Chapter 7 Trustee alleged in the Complaint and the Defendants admitted in their Amended Answer that (a) the Debtor, personally, obtained the June 16, 2003 loan from Vectra Bank; (b) the Debtor, personally, used the proceeds of the June 16, 2003 loan to make a $250,000.00 loan to Scientific Cylinder Corporation; and the Debtor, personally, granted a second deed of trust against the One Finch Property to secure repayment of the loan.[137] However, at trial, Mr. Bryan could not recall which entity—Scientific Cylinder International or Scientific Cylinder Corporation—received the loan. The Chapter 7 Trustee also alleged in his Complaint and the Defendants admitted in their Amended Answer that "on July 18, 2003, the Debtor assigned all his right, title and interest in the SC Note to the Trust."[138] Again, the testimony of Mr. Bryan at trial was more equivocal. He denied the existence of a note made payable to him and stated that any note was directly between the Trust and the borrowing Scientific Cylinder entity. The Court is presented with inconsistent and disparate evidence and testimony by the Debtor.

The most credible evidence here consists of:

(a) the *stipulated* facts set forth above regarding the "personal liability" of Mr. Bryan;

(b) the existence of a Trust Certificate which authorizes the trustee to pledge trust assets for Mr. Bryan's personal indebtedness; and

(c) Mrs. Bryan's January 21, 2005 letter in connection with the January 2005 refinancing, in which she describes the loan as a "Vectra Bank loan *in the name of my husband Gary* for $255,756."[139]

All of these facts lead to the conclusion that there was *no* Scientific Cylinder investment—at least not for the Trust—and that, in fact, the loan was related to the Debtor's personal financial dealings. The fact that the Debtor used what at the time was approximately 50% of the equity in the One Finch Property to secure his personal obligation is clear evidence of not only his total control over the Trust, but also the degree to which the Debtor treated the Trust assets as his own and disregarded any separation between himself and the Trust entity.

---

[137] *See* Complaint and Amended Answer ¶¶ 35, 36 & 38.

[138] Complaint and Amended Answer ¶ *39*.

[139] Plaintiffs' Exhibit 10 (emphasis added).

23

ii.     The Trust Certificate

The Trust Certificate also demonstrates the Debtor's complete dominion and control over and identity of interest with the Trust.[140]  The document provides the trustee of the Trust *unlimited* authority to pledge any and all Trust assets as security for *any* indebtedness of Debtor. *See id.* at "Actions Authorized."  The certificate was not limited to the Scientific Cylinder deal, but states on its face that it "shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender. . ."[141]  Thus, under the Trust Certificate, there is no limitation on the use of the One Finch Property as security for *any* of the Debtor's *personal* obligations.  The evidence demonstrates that the Debtor controlled the Trust.

iii.    Personal Retention of Cash Proceeds of the Refinances and the HELOC

The most significant evidence of dominion and control and a lack of separation between the Bryans and the Trust entity is the undisputed fact that *all of the cash proceeds* from each financing transaction were paid directly to the Debtor and/or Mrs. Bryan and none of the money was deposited into the Trust bank accounts.  The Debtor and Mrs. Bryan testified at trial that most of this money was used to reimburse the Bryans for renovations and repairs to the One Finch Property that were performed in 2000 through late 2001 or early 2002.  The Debtor and Mrs. Bryan further testified that these reimbursements were made pursuant to an oral agreement they reached with the Trust.  The purported oral reimbursement agreement deserves significant attention, both because (a) it forms the basis of the Defendants' primary defense to the First Claim for Relief and (b) the purported agreement, at most, adds further weight to the Court's conclusion that the Trust is a sham trust.

The Court finds the evidence lacking on the Debtor's claim that an oral reimbursement agreement existed and pursuant to this agreement the cash proceeds from refinancing transactions were used to reimburse the Debtor and his wife for funds they advanced to pay for home improvements and renovation.  The Court concludes that there was never any *actual* reimbursement agreement between the Bryans and the Trust.  The bases for this conclusion are numerous.

First, there is no written agreement.

Second, it is significant that neither Mr. Hirsch nor Mr. Hunt, the trustees, or others, were called to testify at trial and corroborate or verify the existence of any such agreement.  Mr. Hunt is a named defendant in this proceeding and did not even appear at trial.  The only testimony the Court has to consider regarding the purported reimbursement agreements is the Bryans' testimony.  For reasons discussed at length, below, the Court cannot rely upon that testimony.

---

[140]    *See* Plaintiff's Exhibit 7.

[141]    *Id.*

24

Third, the claim that the reimbursement agreement was simply an oral agreement is unbelievable. The Debtor was clearly a sophisticated businessman during the period in question, having been involved in one form or another with some thirty-three (33) business ventures. The trustee of the Trust during the years 2000 through 2005, Robert Hirsch, was a licensed attorney. Mr. Bryan testified that his legal relationship with Mr. Hirsch spanned approximately 18 years. In the face of this experience and expertise, the Court finds it simply incredible that none of the parties to the purported reimbursement agreements would have bothered to put the agreements in writing. This conclusion is made even more incredible by the fact that the transactions in question resulted in the withdrawal of more than $400,000.00 in cash and nearly seventy-five percent (75%) of the equity in the One Finch Property.[142]

Fourth, the only writings that were offered into evidence contradict the Bryans' claim of an oral reimbursement agreement. The only writings regarding the financing transactions are found in Plaintiff's Exhibits 10, 14 & 16. In Plaintiff's Exhibit 10, Mrs. Bryan explains the purpose of the January 2005 refinance. There is no mention in this letter of any reimbursement agreement. Rather, Mrs. Bryan says the proceeds from the refinance will be used to payoff a Vectra Loan in the Debtor's name, payoff miscellaneous credit cards, and the "[r]emaining money *will be used* for small home improvements and will be invested."[143] Mrs. Bryan claimed the credit card reference was a reimbursement but no credit card statements or evidence of credit card payments were offered to support this claim. The reference to home improvements is *prospective*, and therefore refers to improvements that have not yet been made. Reimbursement is thus an impossibility.

Plaintiff's Exhibit 16 is more contradictory. Plaintiff's Exhibit 16 is a May 11, 2005 letter from Mrs. Bryan to Mr. Hirsch and purports to be drafted in response to Mr. Hirsch's request for information "concerning recent financial transactions the Trust has approved." Mrs. Bryan offers no explanation in this letter of the February 2003 refinance or the June 2003 Scientific Cylinder investment. With respect to the January 2005 refinancing, Mrs. Bryan states that the "main purpose" of the refinance was to refinance the first and second mortgages into one new loan. Mrs. Bryan offers no other "purpose" for the January 2005 refinancing. With respect to the May 2005 HELOC, Mrs. Bryan again makes no reference whatsoever to reimbursement for renovations. Rather, the only explanation for the HELOC is that the "plan" is to use the proceeds "to provide a line of credit for Auto Source to expand its inventory."[144] There is not a single reference in Plaintiff's Exhibit 16, the purported written explanation of at least two of the financing transactions, to reimbursements or a reimbursement agreement. In fact, the entire thrust of the letter would appear to negate any possibility an agreement ever existed. If Mrs. Bryan has to explain to Mr. Hirsch the "main purpose" for the January 2005 refinance, the only conclusion that can be drawn is that Mr. Hirsch did not know the purpose and therefore was not a party to some prior agreement regarding reimbursements or anything else for that matter.

---

[142]      In addition to supporting the conclusion that there was no reimbursement agreement, the lack of any writing is also viewed as further indicia of a disregard for administrative formalities.

[143]      Plaintiff's Exhibit 10 (emphasis added).

[144]      Plaintiff's Exhibit 16.

Plaintiff's Exhibit 14 is consistent with Plaintiff's Exhibit 16. Plaintiff's Exhibit 14 is Mr. Hirsch's authorization for the HELOC. Again, no reference is made to reimbursements. Rather, Mr. Hirsch states that the approval is given "for the reason that the Line of Credit will generate cash for The Bryan Family Trust." Clearly, reimbursing the Bryans for prior improvements will not generate any cash for the Trust. Thus, not only is there no reference whatsoever in any of the written evidence to a reimbursement agreement, but each document references contrary purposes for the cash outs.

Fifth, the timing of the financing transactions leads to the conclusion that no reimbursement agreement existed. Mrs. Bryan testified that the improvements were made in 2000 through late 2001 or early 2002. The first refinance did not take place until one year later, and the third and fourth financings were not done until 2005. No credible explanation was given for the great delay in obtaining the reimbursement funds or for the apparent piecemeal reimbursement. For that matter, there was more than a half-million dollars in equity when the One Finch Property was first conveyed to the Trust. No credible explanation was given as to why the funds for improvements were not obtained at the time of the initial transfer and funded on a going forward basis. Nor was a credible explanation given for why the entire reimbursement amount was not obtained through the first refinance.

Sixth, no credible evidence was offered as to why the financing transactions were structured as loans to the Bryans and not loans to the Trust. Moreover, if the cashouts were truly intended to benefit the Trust, why were none of the funds ever placed in the Trust bank accounts and then distributed accordingly? Frankly, the structure chosen by the Bryans—to place the One Finch Property in their own names, take out personal loans, and distribute the money to themselves without any Trust involvement—only serves to further blur the lines between the Bryans and the Trust and leads to the conclusion that there was no distinction between the two.

Seventh, the only written evidence offered by the Defendants to support the reimbursement claim is Defendants' Exhibit K. Defendants' Exhibit K consists of a one-page summary and 120 pages of estimates, invoices and receipts. Defendants' Exhibit K was admitted, in part, into evidence over Plaintiff's objection, under the business records exception to hearsay set forth in F.R.E. 803(6). Defendants argue that Defendants' Exhibit K provides the backup for all of the expenses incurred by the Bryans in improving the One Finch Property between 2000 and late 2001 or early 2002. They further argue that they personally paid for home improvements and renovations, thus, it is only proper and necessary that they be reimbursed by the owner of the home, the Trust.

The summary states that the total expense incurred was $160,585.73. The Court finds important deficiencies with Defendants' Exhibit K, and concludes that, if Defendants' Exhibit K shows anything, it shows the Bryans' total disregard for the separateness and integrity of the Trust entity.

The deficiencies in Defendants' Exhibit K include:

(a)     no back up is included for the expenses for "cleaning" totaling $8,640 set forth on the summary;

(b)   the expenses for "landscaping" totaling $2,196.60 include as an "expense" a $900.00 *estimate*;

(c)   many of the seventeen (17) "Joe Doherty" invoices totaling $38,321.11 that are categorized under the "basement and deck" heading consist of hearsay within hearsay and provide little explanation of the services provided;

(d)   in some instances, invoices are counted twice—for example at the pages bates numbered 41-43, the Debtors include 3 invoices from BMC West; the Doherty invoice at page 47, however, includes the same BMW West invoices;

(e)   the "roof" expense of $18,920 is supported by a single document that appears to be either an estimate or the contract for the work and it appears from the document that a balance remains due in the amount of $9,560;[145]

(f)   many of the invoices are for purchases made before the conveyance of the One Finch Property from the Bryans to the Trust;

(g)   many of the invoices and receipts do not identify the One Finch Property; and

(h)   Defendants offered little evidence that many of the expenses set forth in Defendants' Exhibit K were paid with their personal funds.  With respect to this last deficiency, there remains some doubt as to whether many of the expenses are truly reimbursable.

The deficiencies in the category described as "upstairs"[146] are of a whole other order of magnitude.  Defendants' argument is that the Trust benefitted from the expenses evidenced in Defendants' Exhibit K because the work resulted in improvements to the One Finch Property. However, Mrs. Bryan testified that she and her husband have lived in the One Finch Property since its purchase, have enjoyed the benefit of all the purchases, and have no intention of ever selling the One Finch Property.  Nearly all of the expenses regarding the "upstairs" appear to relate to regular living expenses or other ordinary expenses that cannot be categorized as renovations or other capital improvements.  Alternatively, the inclusion of the types of expenses included under the "upstairs" heading further blurs the line between the Trust and the Bryans.

For example, the "upstairs" expenses included what appears to be regular carpet cleaning expenses.[147] It is a mystery how the Trust benefitted from regular carpet cleaning.  The majority of the "upstairs" expenses are for furniture purchases.[148]  As the furniture was purchased no later than 2001 and the Bryans have enjoyed and continue to enjoy the daily use of such furniture, the Court finds it difficult to reach the conclusion that any of the furniture purchases were the types

---

[145]   Defendants' Exhibit K, at 105.

[146]   See *id.* at 106-157.

[147]   See *id.* at 106-07, 109.

[148]   See *id.*, at 108, 110-11, 113-15, 121-24, 126-31, 135-39, 142-43, 147-48, 151-52, 154, 155, 157.

27

of capital expenditures deserving reimbursement. Each of the twenty-one (21) invoices from "DCL Design Lines" appears to cover a combination of furniture purchases or "design services" in connection with furniture purchases. In some instances, the receipts under the "upstairs" heading provide no information as to what was purchased.[149]   A comparison of the "proposal" for hardwood floor refinishing from S&S Floor Surfacing at page 133 with the two invoices for hardwood floor refinishing from Rock Solid Hardwood Services at pages 116-17 would suggest that the Defendants claim reimbursement is due for work that was not actually performed. Several of the "upstairs" expenses are for plants—there is no indication in the invoices whether any of these plants are seasonal or permanent additions to the One Finch Property. The Bryans have included in their reimbursement invoices a receipt for a $427.73 "Vita-Mix" blender,[150] a receipt for moving a piano from California[151] and three invoices from Soundtrack that total nearly $3,000.00 for unidentifiable merchandise.[152]

As stated, it difficult to see a connection between the "upstairs" expenses and any benefit to the Trust and the expenses seem to again accentuate the blur of the line between the Bryans and the Trust.

There is another conclusion that can be drawn from the "upstairs" expenses, however, and that conclusion perfectly illustrates the reasons why "[i]t is against public policy to permit a man to tie up his own property in such a way that he can still enjoy it but can prevent his creditors from reaching it."[153]   During the period that the Debtor was attempting the keep the One Finch Property out of the reach of Mr. Clark and his $211,000.00 judgment, he was enjoying the fruits of that asset with impunity.  He enjoyed all of this new furniture, the new roof, the finished basement, the new deck, the Vita-Mix, and the Soundtrack merchandise. There can be no doubt that during the period in question, the only exemption available with respect to the One Finch Property was the then-effective $45,000.00 homestead exemption. But for all of the refinances, there was most certainly enough non-exempt equity in the One Finch Property to satisfy the Clark claim in full. Indeed, the purchase of the Range Rover fits within the same category. The Debtor converted non-exempt cash and vehicles into a Range Rover titled in the name of the Trust and potentially beyond the reach of his creditors. But for the existence of the Trust, the Range Rover itself and later the $30,488 in sales proceeds were non-exempt assets that could have been used to satisfy the Clark judgment.   The universal rule that a man cannot "tie up his own property in such a way that he can still enjoy it but can prevent his creditors from reaching it" exists to prevent *exactly* the self-serving manipulations that the Debtor has engaged in here: living a lavish lifestyle while his creditors are left empty-handed.

Finally, the Court cannot conclude an oral reimbursement agreement existed because to do so the Court must rely almost exclusively on the credibility of the Debtor and Mrs. Bryan.

---

[149]      *See id.* at 119-20, 134, 150, 153.

[150]      *See id.* at 149.

[151]      *See id.* at 156.

[152]      *See id.* at 150, 153, 155.

[153]      *Cohen*, 8 P.3d at 433.

The Court finds neither witness is credible. The lack of credibility stems from the rank inconsistencies between the witnesses' testimony and other evidence, the lack of corroborating witnesses, and the Debtor's pattern of concealment. The testimonial inconsistencies are numerous. As discussed above, Plaintiff's Exhibits 10, 14 & 16 contradict the Defendants' claim that an oral reimbursement agreement existed. In fact, if Mrs. Bryan's testimony at trial regarding reimbursement is to be believed, the Court must necessarily find that her representations to the lender in Plaintiff's Exhibit 10 and to Mr. Hirsch in Plaintiff's Exhibit 16 were *false* representations. Mrs. Bryan also stated in Plaintiff's Exhibit 16 that the purpose of the HELOC was to obtain funds for providing a line of credit to Auto Source. The evidence points to a finding this too was a false representation. At most $25,000.00 of the $55,000.00 obtained through the HELOC was paid to Auto Source, no evidence was offered as to the disposition of the remaining funds, no written agreement with Auto Source regarding the purported line of credit agreement was produced, and no representative of Auto Source (despite the fact that Auto Source is a named defendant) was called to testify at trial. For that matter, no witnesses who could corroborate the Bryans' testimony—namely, Mr. Hirsch, Mr. Hunt and the principal of Auto Source, Craig Rostvedt—were called to testify.

The Debtor's pattern of concealment, moreover, continued unabated through the case. The only mention of the Trust in his bankruptcy filing was on the original Schedule G as the lessor of the One Finch Property.[154] However, despite the fact that he was a lessee under the lease in existence on the Petition Date, the Debtor inexplicably filed an Amended Schedule G deleting the reference to a lease.[155] As a result, through trial, the Debtor's Statement of Financial Affairs and Schedules as amended, and *signed by Debtor under penalty of perjury*, contain *no reference whatsoever* to the Trust or to any of the transfers relating to the One Finch Property. The Debtor has never disclosed his beneficial interest in the Trust in Schedule B. He did not disclose the January 2005 or May 2005 deed of trust transfers in his responses to Questions 3 or 10 on his Statement of Financial Affairs. He did not disclose either deed of trust transfer as a secured debt on his Schedule D. He did not disclose the May 2005 quitclaim deed transfers of the One Finch Property to and from the Trust in response to Question 10 on his Statement of Financial Affairs.

The two Vectra Bank deeds of trust are especially curious and troubling. Both the Debtor and Mrs. Bryan admitted in their responses to the Chapter 7 Trustee's requests for admission that both were parties to the HELOC.[156] These admissions were made under oath and verified. Yet at trial, both stated that their admissions were incorrect. Both testified repeatedly that the Debtor had no interest in the January 2005 refinance or the May 2005 HELOC, despite the fact that their own exhibits—Defendants' Exhibits U & X—clearly show Debtor conveying security interests to Vectra Bank to secure his repayment obligations on the two notes. Either the Bryans' testimony at trial regarding these loans was false or the Bryans falsely represented Mr. Bryan's

---

[154]   *See* Plaintiff's Exhibit 17.

[155]   *See* Defendants' Exhibit J; Plaintiff's Exhibit 18.

[156]   *See* Plaintiff's Exhibit 21 at Request No. 7, page 3; Plaintiff's Exhibit 22 at Request No. 7, page 3.

interest in the One Finch Property to Vectra Bank in January and May 2005 in order to obtain the loans. Either way, there are false representations being made.[157]

Based upon all of the foregoing, the Court places very little weight on the Bryans' trial testimony. Aside from the obvious concerns about the testimony being self-serving, both the Debtor and Mrs. Bryan have repeatedly made false representations of fact with respect to the One Finch Property and the financing transactions. Certain of those false representations have been made under oath. The Court simply cannot rely upon the Bryans' testimony as truthful.

### 4. Conclusion

The Court has followed its prior instruction that "all of the indicia of ownership, authority, control, administration, and benefit, must be taken together and measured to determine whether or not the trust can be legitimately and fairly deemed a spendthrift trust under state law."[158]  Based upon this analysis of all the evidence, the Court concludes that the Trust is a sham trust because:

    (a)    the Bryans exercised complete dominion and control over the Trust and the purported trust assets;

    (b)    the Bryans ignored formalities;

    (c)    the Bryans used Trust property as their own; and

    (d)    the integrity of the Trust was disregarded.

Accordingly, the Court concludes all of the Debtor's interests in Trust assets are property of the estate under 11 U.S.C. § 541(a)(1). There are three purported Trust assets: real property, the One Finch Property, and certain personal property conveyed to the Trust on or about June 1, 2001, plus the proceeds from the sale of the Range Rover. The Court finds that, based upon the initial warranty deed and subsequent transfers, as of the Petition Date, the Debtor and Mrs. Bryan each owned an equal, undivided one-half interest in the One Finch Property as tenants in common. The estate and Mrs. Bryan therefore now each own an equal, undivided one-half interest in the One Finch Property as tenants in common. The Court further finds that, based upon the Debtor's testimony that his assets alone were used to purchase the Range Rover, the estate owns 100% of the interest in the proceeds from the sale of the Range Rover. Judgment shall enter in favor of the Chapter 7 Trustee and against the Defendants as to the Chapter 7 Trustee's First Claim for Relief.

---

[157]    The Debtor's testimony is also contradicted in multiple instances by other evidence. He disclosed $1,920 in household goods on his Schedule B despite testifying that he has not purchased any household goods since the 2001 transfer of the home furnishings to the Trust. Mr. Bryan testified that he believed Mr. Hirsch was paid $100 a month for his services as trustee, but the bank records refute this contention.

[158]    *Alagna*, 107 B.R. at 313.

**B.  Plaintiff's Second Claim for Relief – Turnover – One Finch Property**

In his Second Claim for Relief, Plaintiff seeks judgment pursuant to 11 U.S.C. § 542 requiring the Debtor and Mrs. Bryan to turnover the One Finch Property.

11 U.S.C. § 542(a) requires an entity in possession, custody, or control of property that the Chapter 7 Trustee may use to deliver to the Trustee and account for the property or the value of such property.  The Court has determined that the Debtor's interest in the One Finch Property is property of the estate.  It is undisputed that the One Finch Property has use for the estate inasmuch as the Chapter 7 Trustee seeks authority to sell the One Finch Property.  The Bryans remain in the One Finch Property and, in contesting this matter through trial, clearly refuse to turnover the One Finch Property absent Court order.  Therefore, because the elements of 11 U.S.C. § 542(a) are satisfied, the Court concludes the relief requested under the Second Claim for Relief is reasonable and appropriate.  Judgment shall enter in favor of the Chapter 7 Trustee and against Defendants Debtor and Mrs. Bryan requiring said Defendants to turnover the One Finch Property to the Chapter 7 Trustee.  Said turnover shall be made within 10 days of entry of judgment.

**C.      Plaintiff's Third Claim for Relief – Turnover – Range Rover Sale Proceeds**

In his Third Claim for Relief, Plaintiff seeks judgment pursuant to 11 U.S.C. § 542 requiring Auto Source to turnover the proceeds from the sale of the Range Rover in the amount of $30,488.

As stated above, 11 U.S.C. § 542(a) requires an entity in possession, custody, or control of property that the Chapter 7 Trustee may use to deliver to the Trustee and account for the property or the value of such property.  The Court has determined that the all of the proceeds from the sale of the Range Rover are property of the estate.  It is undisputed that the property has use for the estate.  Because the elements of 11 U.S.C. § 542(a) are satisfied, the Court concludes the relief requested under the Second Claim for Relief is proper.  Judgment with respect to this claim is reasonable and appropriate, moreover, based upon Auto Source's failure to appear and defend at trial and offer any defense to the Third Claim for Relief.  Judgment shall therefore enter in favor of the Chapter 7 Trustee and against Defendant Auto Source in the amount of $30,488.  The judgment shall require Auto Source to turnover said amount to the Chapter 7 Trustee within 10 days of entry of judgment.

**D.      Plaintiff's Fourth through Eleventh Claims for Relief**

This Court incorporates its prior ruling granting Defendants' Motion for Reconsideration of Order Denying Motion for Summary Judgment.[159]  The Court issued its Order and Judgment based on the statute of limitations defense raised by the Defendants under 11 U.S.C. § 546(a)

---

[159]      Docket #88 and #89.

### E.   Plaintiff's Twelfth Claim for Relief – Constructive Trust

In his Twelfth Claim for Relief, Plaintiff seeks imposition of a constructive trust against the One Finch Property and the proceeds from the sale of the Range Rover. This claim was pled in the alternative to the First Claim for Relief. Although the Court has granted judgment in favor of the Plaintiff as to the First Claim for Relief, it also finds and concludes that relief should be granted, as well, under the Twelfth Claim for Relief.

The Court finds that all of the elements required for imposition of a constructive trust are satisfied and judgment on the Twelfth Claim for Relief is appropriate.

"A constructive trust is a remedial device designed to prevent unjust enrichment."[160] "In general, 'a constructive trust is imposed ... because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.'" [161] "The doctrine of constructive trusts is extremely flexible."[162] In *Yetter Well Service, Inc. v. Cimarron Oil Co., Inc.*,[163] the Colorado Court of Appeals affirmed a trial court's imposition of a constructive trust to prevent unjust enrichment where a third-party transferee had succeeded to property interests which rightfully belonged to a judgment debtor, "as a result of transactions intended to delay and hinder the latter's creditors."

The Court finds that the transfer of the Debtor's property interests to the Trust were made with the intent to delay and hinder his creditors. The fact that all of the Debtor's machinations with the Trust assets were occurring against the backdrop of the litigation against Mr. Clark amply demonstrates the actual intent to hinder, delay and defraud creditors. All of these actions appear to have been undertaken with one purpose in mind: to hinder, delay and defraud Mr. Clark. There is simply no other reasonable conclusion that can be drawn from the stipulated facts and the evidence at trial. Evidence of an actual intent to hinder, delay and defraud creditors, includes the following facts:

The transfer was made to an insider, the Trust.

(a)   The Debtor retained possession of the One Finch Property after the transfer.

(b)   The transfer was concealed (and remains concealed to this day on the Debtor's original and amended Statement of Financial Affairs).[164]

---

[160]   *Mancuso v. United Bank*, 818 P.2d 732, 737 (Colo.1991) *citing* G. Palmer, 1 *Law of Restitution,* § 1.3 at 12 (1978).

[161]   *Mancuso,* 818 P.2d at 737 *quoting Restatement (Second) of Trusts,* ch. 12, introductory note at 326 (1959).

[162]   *Mancuso,* 818 P.2d at 737.

[163]   841 P.2d 1068 (Colo. App. 1992).

[164]   *See* Plaintiff's Exhibits 17, 19, 20.

32

(c)      Before the transfer was made the Debtor had been sued or threatened with suit. In fact, judgment had already entered in favor of Mr. Clark in the Denver District Court action.

(d)      The transfer was of substantially all of the Debtor's assets. The Debtor testified that his assets and liabilities did not change from the beginning of 2005 until the Petition Date. In the Schedules, the Debtor originally disclosed assets with a total value of $88,993.71.[165] He then amended his schedules to disclose assets with a total value of $143,776.75.[166] As the One Finch Property is worth at least $755,000.00, the transfer of the interest in the One Finch Property by quitclaim in May 2005 was clearly a transfer of substantially all of the Debtor's assets.

(e)      The Debtor concealed the One Finch Property.

(f)      The value of the consideration received by the Debtor for the transfer was not reasonably equivalent to the value of the asset transferred. The Debtor received nothing for the May 2005 quitclaim transfer but gave up all of his substantial equity in the One Finch Property.[167]

(g)      The Debtor was insolvent or became insolvent shortly after the transfer was made. As stated, the Debtor testified that his assets and liabilities were essentially static during 2005. His Schedules, both original and amended, show that his liabilities significantly exceed his assets. His 2005 income, on both the original and amended schedules, was not sufficient to make up the difference. The evidence is clear that the Debtor was insolvent throughout 2005.[168]

Moreover, as stated above in the discussion regarding the First Claim for Relief, the fact that all of the Debtor's machinations with the Trust assets were occurring against the backdrop of the litigation against Mr. Clark amply demonstrates the actual intent to hinder, delay and defraud creditors. All of these actions appear to have been undertaken with one purpose in mind: to hinder, delay and defraud Mr. Clark. Accordingly, had the First Claim for Relief not been granted, the Court would grant judgment in favor of the Chapter 7 Trustee as to the Twelfth Claim for Relief.

Accordingly, the Court grants judgment in favor of the Chapter 7 Trustee as to the Twelfth Claim for Relief and impose a constructive trust for the benefit of the estate against the Debtor's interest in all Trust assets, including an equal, undivided one-half interest in the One Finch Property, certain personal property, and 100% of the $30,488 in proceeds from the sale of the Range Rover.

---

[165]      *See* Plaintiff's Exhibit 17.

[166]      *See* Plaintiff's Exhibits 19, 20

[167]      *See, e.g. Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo. App. 2006) (finding reasonably equivalent value not given where transferor did not receive any benefit, direct or indirect, from transfer).

[168]      *See* Plaintiff's Exhibits 17, 19, 20.

**F.    Plaintiff's Thirteenth Claim for Relief – Sale of One Finch Property
Pursuant to Section § 363(h)**

In his Thirteenth Claim for Relief, Plaintiff seeks judgment authorizing him to sell the
One Finch Property pursuant to 11 U.S.C. § 363(h).

Under 11 U.S.C. § 363(h), a Chapter 7 trustee may sell both the bankruptcy estate's
interest and the interest of any co-owner in property pursuant to 11 U.S.C. § 363(h) if the
following requirements are met: (1) partition in kind of the property among the estate and the co-
owner is impracticable; (2) sale of the estate's undivided interest in the One Finch Property
would realize significantly less for the estate than sale of the One Finch Property free of the
interest of the co-owner; (3) the benefit to the estate of a sale of the property free of the interest
of the co-owner outweighs the detriment, if any, to the co-owner; and, (4) the property is not
used in the production, transmission, or distribution, for sale, of electric energy or of natural or
synthetic gas for heat, light, or power.

At trial, the Chapter 7 Trustee testified that each of the first three elements were satisfied:
first, partition is impracticable because the One Finch Property consists of a single family
dwelling; second, sale of the estate's interest in the One Finch Property would realize
significantly less for the estate than sale of the One Finch Property free of the interest of Mrs.
Bryan because no potential purchaser would pay full-price to purchase an co-ownership interest
with a stranger such as Mrs. Bryan; and third, the benefit to the estate of a sale of the One Finch
Property free of the interest of Mrs. Bryan outweighs the detriment, if any, to Mrs. Bryan
because Mrs. Bryan would not be benefitted by sharing a ownership interest with a stranger and
Mrs. Bryan will also receive more on account of her interest if the entire property is sold.  No
contrary evidence as to these first three elements was offered by Defendants.  Defendants
stipulated that the fourth element was satisfied.

Therefore, because the elements of 11 U.S.C. § 363(h) are satisfied, the Court concludes
the relief requested under the Thirteenth Claim for Relief is reasonable and appropriate.
Judgment shall enter in favor of the Chapter 7 Trustee and against Defendant Mrs. Bryan
authorizing the Trustee to sell the One Finch Property free and clear of Mrs. Bryan's interest.
Pursuant to 11 U.S.C. § 363(j), the Chapter 7 Trustee is authorized to distribute to Mrs. Bryan
and to the bankruptcy estate the proceeds of such sale, less the costs and expenses of sale, not
including any compensation to the Trustee, according to the interests of the co-owner and of the
bankruptcy estate.   In addition, the Trustee may offset the judgment of $52,001.23 owed by
Mrs. Bryan on the Eighth and Ninth Claims for Relief against Mrs. Bryan's one-half share of the
net proceeds of sale.

34

## VI.   Order

Based upon the above and foregoing,

IT IS HEREBY ORDERED that:

A.   Plaintiff's First Claim for Relief is GRANTED.  The Trust assets are assets of the estate.

B.   Plaintiff's Second Claim for Relief is GRANTED and the One Finch Property is ORDERED to be turned over to the Trustee.  In conjunction with the turnover of the One Finch Property, the Debtor shall further provide the Plaintiff a detailed inventory and itemization of all household goods and furnishings transferred to the Trust on or about June 1, 2001, and shall further turn over to the Trustee such household goods and furnishings identified in the inventory and itemization.  Said turnover shall be made within **15** days of entry of this Order and the Judgment issued concurrently herewith.

C.   Plaintiff's Third Claim for Relief is GRANTED and the proceeds from the sale of the Range Rover are ORDERED to be turned over to the Trustee. Said turnover shall be made within **15** days of entry of this Order and the Judgment issued concurrently herewith.

D.   Plaintiff's Twelfth Claim for Relief is GRANTED.  Under the alternative basis for relief, this Court concludes that the imposition of a Constructive Trust is also appropriate.

E.   Plaintiff's Thirteenth Claim for Relief is GRANTED.  Plaintiff is granted authority to sell the Trust property turned over pursuant to 11 U.S.C. §363.

Dated this 4th day of June, 2009.

BY THE COURT:

_Sid Brooks_
_____
The Honorable Sidney B. Brooks
United States Bankruptcy Judge